UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
DIAMOND CHAVANNES,                                                    **COMPLAINT**

                                        Plaintiff,                        Plaintiff Demands
         -against-                                                         Trial by Jury

THE BRONX PARENT HOUSING
NETWORK, INC., VICTOR RIVERA,
CANDIA RICHARDS CLARKE,
MARIO PALUMBO, DANIEL TIETZ,
THE CITY OF NEW YORK, and
THE NEW YORK CITY DEPARTMENT OF
HOMELESS SERVICES,

                                        Defendants.
------------------------------------------------------------X


        Plaintiff by her attorneys, DeTOFFOL & GITTLEMAN, Attorneys at Law, upon

information and belief, complains of the Defendants herein, alleging at all relevant and

materials times and upon information and belief, as follows:

### Nature of The Case

        Plaintiffs complain against Defendants pursuant to Title VII of the Civil Rights Act

of 1964, 42 U.S.C. Section(s) 2000e et seq., as amended ("Title VII"), and pursuant to

Gibb, 38 U.S. 715 (1966), the New York State Human Rights Law under NYS Executive

Law §296 et. seq. ("NYSHRL"),  the New York City Human Rights Law under NYC

Administrative Code § 8-107(4) et. seq. ("NYCHRL") and New York common law

assault and battery, and seek damages to redress the injuries Plaintiff has suffered as a

result of race and sex discrimination, hostile work environment, retaliation, and wrongful

termination.

1

## Jurisdiction & Venue

1.      Jurisdiction of this action is conferred upon the Court insofar that this action involves a federal question under Title VII of the Civil Rights Act. The Court, pursuant to *Gibb*, 38 U.S. 715 (1966), also has supplemental jurisdiction over the Counts based on laws of the State of New York.

2.      Venue is proper in this district under 28 U.S.C. §1391(b) and otherwise based upon the fact that a substantial part of the events or omissions giving rise to the claim occurred within the Southern District of the State of New York, and Plaintiff was employed by Defendants within the Southern District of the State of New York.

3.      Plaintiff received a Right to Sue Letter dated June 4, 2021, and this Complaint has been filed within 90 days of receipt of the aforementioned permission letter [*Right to Sue Letter Annexed hereto*].

4.      Prior to commencement of this lawsuit Plaintiff timely and duly served a Notice of Claim dated April 13, 2021.

5.      Plaintiff DIAMOND CHAVANNES ("Ms. Chavannes", "Employee", "Plaintiff") is an African American Black female individual who resides in the City, County and State of New York.

6.      THE BRONX PARENT HOUSING NETWORK, INC. (s/h/a "Network") is an entity, existing under and by virtue of the laws of the State and City of New York.

7.      Defendant THE CITY OF NEW YORK (s/h/a "NYC") was, and still is, a municipal entity, duly organized and existing pursuant to the laws of the State of New York.

8.      Defendant, NEW YORK CITY DEPARTMENT OF HOMELESS SERVICES, (s/h/a "NYC DEPT. OF HOMELESS SERVICES"), was, and still is, a domestic

municipal corporation/agency duly organized and existing under and by virtue of the laws of the State of New York.

9.      On or about January 2020, Plaintiff Ms. Chavannes began her employment at the Defendant NYC, NYC Dept. Of Homeless Services, and Network's housing depot, located at 488 E 164th Street, Bronx, NY 10456 ("Workplace").

10.     Plaintiff Ms. Chavannes has more than ten years of human resources experience and holds a Master's degree in Human Resource Management.

11.     Defendants NYC, NYC Dept. Of Homeless Services, and Network (collectively "Defendant Entities") were employers, conducting their functional operations as a public agency.

12.     Plaintiff was employed by Defendant Entities, having the job title Employee Relations Specialist.

13.     VICTOR RIVERA (hereinafter "CEO") is an adult male individual, employed with the title Chief Executive Officer by Defendant Network, with funding, supervisory authority, performance authority, and hiring and firing capacity over Ms. Chavannes.

14.     CANDIA RICHARDS CLARKE (hereinafter "HR Head") is an adult female individual, employed with the title Chief Operating Officer by Defendant Network, with funding, supervisory authority, performance authority, and hiring and firing capacity over Ms. Chavannes.

15.     MARIO PALUMBO (hereinafter "HR Supervisor") is an adult white male individual, employed with the title Vice President of Human Resources by Defendant Network, with supervisory authority, performance authority, and hiring and firing capacity over Ms. Chavannes.

16.     DANIEL TIETZ (hereinafter "CEO Tietz") is an adult white male individual, employed with the title Interim CEO by Defendant Network, with funding authority, supervisory authority, performance authority, and hiring and firing capacity over Ms. Chavannes.

17.     To assist in fulfilling its public obligation, the Defendant NYC funds not-for-profit organizations, whose principal business is to serve and house the New York City homeless population.

18.     The Defendant Network, a not-for-profit organization whose principal business is to serve and house the New York City homeless population, has received funding from the Defendant NYC to assist NYC in fulfilling its public obligation to its homeless population constituency.

19.     Defendant Network is an agent to Defendant NYC and Defendant NYC Dept. Of Homeless Services, by respondeat superior and otherwise vicariously liable in, inter alia, operating to fulfill the Defendant NYC's public obligation to serve the homeless population.


**Facts Concerning Defendants' Unlawful Actions**

20.      Plaintiff incorporates herein by reference the preceding paragraphs as if fully set forth herein.

21.     Throughout Plaintiff's employment by Defendant Network, Ms. Chavannes was subjected to, and victim of, race discrimination, sex discrimination, sex and race motivated adverse employment actions, racist and sexist comments, and a hostile work environment.

22.     Beginning on or about September 2020, HR Supervisor Palumbo subjected Ms. Chavannes to a grossly discriminatory environment that included consistent and continuous unwelcome vicious comments based on Ms. Chavannes' race.

23.     In the presence of Ms. Chavannes, and on numerous occasions, HR Supervisor Palumbo would casually use the word "Nigger" in conversation and storytelling in the Workplace.

24.     In the presence of Ms. Chavannes, and on numerous occasions, HR Supervisor Palumbo would imitate African American Black employees within the Workplace using racist stereotypes and derogatory, caricatured accents.

25.     Ms. Chavannes informed HR Supervisor Palumbo of her objection to the use of the racist and bigoted terms and racist stereotypes, but HR Supervisor Palumbo informed her that he was justified in using the words and derogatory imitations in the context of storytelling.

26.     These remarks and comments were severe, offensive, unwelcome, and consistent with a pattern of derogatory treatment and behavior towards Ms. Chavannes.

27.     In the context of HR Supervisor Palumbo's derogatory comments, unlike her Latino and Caucasian co-workers, and at HR Supervisor Palumbo's direction, Ms. Chavannes was routinely required to perform work outside her job responsibilities.

28.     On or about September 2020, Ms. Chavannes complained to HR Supervisor regarding his intentional racial harassment and the racially motivated disparate treatment that she was subjected to.

29.    Mr. Palumbo responded to Ms. Chavannes' complaints of racial discrimination with a threat of retaliation, stating, "If I were you, I'd be very careful about the statement I make."

30.    HR Supervisor Palumbo engaged in an unlawful employment practice by discriminating against Plaintiff because of her race and/or color, with respect to the terms, conditions and/or privileges of employment, when Defendants failed to promote Plaintiff.

31.    HR Supervisor Palumbo further retaliated against Ms. Chavannes for making complaints of harassment and disparate treatment by assigning her to a mandatory "Employee Assistance Program" that provided employees with counseling to help employees manage their emotions.

32.    In support of HR Supervisor Palumbo's decision to issue mandatory counseling, HR Supervisor Palumbo invented and issued Ms. Chavannes an "Employee Disciplinary Report," constituting a series of fabricated scenarios of misbehavior on the part of Ms. Chavannes spanning several months.

33.    The fabricated scenarios within the Employee Disciplinary Report, created only after Ms. Chavannes' complaints, were draped in racial stereotypes, painting Ms. Chavannes as aggressive and angry, and further misrepresenting the way she communicates: in a style that resembled the above referenced derogatory caricature of African Americans and Black Americans.

34.    Upon presenting Ms. Chavannes with the Employee Disciplinary Report, HR Supervisor Palumbo threatened further retaliation and stated, "Diamond, you do not

want to battle with me because you won't win.  You may not know this but Mr. Rivera really likes me."

35.    Ms. Chavannes' complaints and objections to racial comments did not prompt any action by HR Supervisor or Defendant Entities.

36.    The same day in which HR Supervisor Palumbo brazenly threatened Ms. Chavannes with retaliation, and only after HR Supervisor Palumbo refused to respond to Ms. Chavannes' reports of ongoing racial harassment, Ms. Chavannes' sought out the assistance of CEO Rivera.

37.    Ms. Chavannes provided CEO Rivera with a detailed account of HR Supervisor Palumbo's racial harassment, retaliation, and punishment in the form of a fabricated disciplinary report.

38.    In response, CEO Rivera scheduled a meeting with Ms. Chavannes, HR Supervisor Palumbo, HR Head Clarke, and himself.

39.    During this meeting, HR Supervisor Palumbo's racial harassment and retaliation was not addressed, and Defendants scheduled no follow-up meeting.

40.    Following this meeting, the harassment not only continued but increased in both frequency and intensity.

41.    Following this meeting, HR Head Clarke became increasingly unjustifiably critical of Ms. Chavannes' performance.

42.    Following this meeting, HR Head Clarke became increasingly hostile and aggressive in her demeanor towards Ms. Chavannes.

43.     It did not surprise Ms. Chavannes that HR Head Clark did not help resolve her complaints because, on numerous occasions, HR Head Clarke used her supervisory powers to undermine Ms. Chavannes' ability to do her job.

44.     For example, a Defendant Network employee filed a complaint with human resources regarding misbehavior by HR Supervisor Palumbo, and instead of following company guidelines requiring the complaint be kept confidential, HR Head Clarke immediately forwarded the complaint to HR Supervisor Palumbo.

45.     HR Supervisor Palumbo and HR Head Clarke have taken actions to prevent Plaintiff from being promoted in retaliation for her complaints of racial discrimination.

46.     On numerous occasions, including during a meeting in December of 2020, HR Director Palumbo reminded Ms. Chavannes that complaints brought against him or HR Head Clarke would be met with retaliation.

47.     On or about December 2020, during a conversation in which HR Supervisor Palumbo threatened retaliation, he further insisted to Ms. Chavannes that CEO Rivera would be no help in preventing harassment because he was simply a figurehead and that it was, in fact, HR Head Clarke who operated Defendant Network.

48.     HR Supervisor Palumbo threatened further retaliation for Ms. Chavannes having made said earlier complaint of racially charged misconduct, and he meant it to further intimidate her from ever supporting that claim and complaining in the future.

49.     Defendant Entities failed to engage in any meaningful interactive process to address any of the aforementioned racial discrimination incidents, and all of the involved supervisors remained in Defendants' employment.

50.    On or about December 2020, HR Supervisor Palumbo issued an additional fabricated disciplinary report against Ms. Chavannes.

51.    On numerous occasions, HR Supervisor Palumbo canceled Ms. Chavannes' scheduled site visits to undermine her ability to perform her duties.

52.    HR Head Clarke and CEO Rivera were aware that the harassment was ongoing, that it had become routine and was carried out by HR Supervisor Palumbo.

53.    HR Head Clarke, in conversation with Ms. Chavannes, insisted that the racist harassment by HR Supervisor Palumbo was the direct result of Ms. Chavannes not knowing how to talk to HR Supervisor, boldly assigning fault to the victim.


**Sexual Harassment Discrimination and Retaliation**

54.    On or about September 2, 2020, as previously delineated, after HR Supervisor Palumbo refused to respond to Ms. Chavannes' reports of ongoing racial harassment, Ms. Chavannes' sought out the assistance of CEO Rivera.

55.    Instead of relieve in the way of ameliorating action by CEO Rivera or Defendant Entities, Ms. Chavannes' complaint prompted CEO Rivera to subject Ms. Chavannes to sexual harassment, quid pro quo sexual harassment, and retaliatory sexual harassment.

56.    Following the September 2020 meeting, CEO Rivera subjected Ms. Chavannes to daily, sustained, and continuous harassing behavior in the Workplace:

   a. CEO Rivera publically and daily ogled at Ms. Chavannes' body, prompting
      Ms. Chavannes to explain to CEO Rivera that other employees would

notice his inappropriate behavior and that he should immediately discontinue his actions;

b. CEO Rivera made inappropriate comments to Ms. Chavannes about her attractiveness during virtually all interactions between them in which no third-party was present;

c. CEO Rivera often pried into Ms. Chavannes' personal life in search of sexual details: this often involved being overly familiar and flirtatious, repeatedly using sexual language and innuendos, or forcing her to meet with him alone;

d. CEO Rivera, on a weekly basis, played sexually charged mind games with Ms. Chavannes: for example, speaking to Ms. Chavannes in Spanish while leering at her body from top to bottom, refusing to translate what she believed to be inappropriate comments;

e. Weekly, CEO Rivera played sexually charged mind games with Ms. Chavannes: Without context or prior conversation, CEO Rivera would state to Ms. Chavannes, "Yes or No," and then force her to respond and then inform her that she had agreed or disagreed with a sexually charged question or act;

f. On numerous occasions, during the period of her performance reviews, CEO Rivera communicated to Ms. Chavannes that she should engage in sexual conduct as a quid pro quo for continued employment and career advancement.

57.     On or about September 2020, in the context of CEO Rivera staring at Ms. Chavannes' body, CEO Rivera informed Ms. Chavannes that "he was a real man and knew how to treat a woman."

58.     On or about September 3, 2020, after the meeting attended by Ms. Chavannes, HR Supervisor Palumbo, HR Head Clarke, and CEO Rivera (a meeting prompted by HR Director's inappropriate behavior - as previously delineated), Mr. Rivera approached Ms Chavannes, kissed her on the forehead, wrapped his arms around her shoulders, and informed her that their "relationship had changed."

59.     CEO Rivera further informed Ms. Chavannes that he would ensure that she was promoted with a pay raise, and in doing so, he physically grabbed and pulled her close to his body so that their faces were virtually touching.

60.     The inappropriate grab and pull prompted Ms. Chavannes to pull away from CEO Rivera.

61.     The physical, sexual assault, forcible sexual touching, and interaction with CEO Rivera were brazen attempts by CEO Rivera to communicate sexual conduct quid pro quo for continued employment and protection from race based harassment and retaliation by HR Supervisor Palumbo.

62.     On or about October 2020, CEO Rivera approached Ms. Chavannes, placed his arms around her shoulders, and over Ms. Chavannes' objection to the physical touching, told her that he loved her.

63.     On or about October 2020, CEO Rivera isolated Ms. Chavannes in his office, told her that she was sexy and beautiful, and asked her about her sex life.

64.     On or about October 2020, CEO Rivera approached Ms. Chavannes in the Workplace Kitchen, spoke in Spanish to Ms. Chavannes while leering at her body from top to bottom, and refused to translate what she believed to be inappropriate comments.

65.     On or about November 2020, CEO Rivera FaceTimed Ms. Chavannes and told her that God created him to be her husband.

66.     During said FaceTime call, CEO Rivera stated that Ms. Chavannes deserved to be loved and that when he said "loved," he was referring to "the kind of love from a man that comes with intimacy, the kind that would make my toes curl."

67.     On or about November 2020, CEO Rivera asked Ms. Chavannes, "Yes or No?" without context or prior conversation. After his insistence that she answer in the affirmative, she replied, "Yes." He then informed her that she agreed that the sex between the two of them "would be good."

68.     On or about November 2020, immediately following the "Yes or No" mind game, CEO Rivera made additional comments regarding sex toys and Ms. Chavannes' physical attractiveness.

69.     On or about November 2020, CEO Rivera approached Ms. Chavannes and groped her buttocks while she was leaning over a co-worker's computer.

70.     On or about December 2020, CEO Rivera insisted that Ms. Chavannes accompany him on vacation to the Dominican Republic and informed her that she had already agreed as a result of his "Yes or No" game.

71.     In response to CEO Rivera's insistence that they vacation together, Ms. Chavannes informed him that she was not comfortable accompanying him on vacation,

prompting CEO Rivera to tell Ms. Chavannes how sexy she was and that she needed to have some fun.

72.     On or about December 2020, CEO Rivera insisted that Ms. Chavannes tattoo his initials on her lower back.

73.     On or about December 21, 2020, Ms. Chavannes returned to the Workplace from a field visit, at which time, CEO Rivera asked Ms. Chavannes if she had received her Christmas gift bag.  Following this interaction, Ms. Chavannes went to her desk where she found her gift bag and returned to CEO Rivera's office to inform him she found the gift.

74.     In response, CEO Rivera forcibly grabbed Ms. Chavannes by the waist, kissed her neck, and stated, "You're a good girl, Ms. Diamond. I love you."

75.     Ms. Chavannes objected to each occurrence of discriminatory, humiliating, sexually perverted, filthy, lewd, unwelcome, crude, and inappropriate behavior, and unwanted physical contact and advances engaged in by CEO Rivera.

76.     This inappropriate environment was sustained and continued, despite her protests and complaints to CEO Rivera.

77.     HR Head Clarke and HR Supervisor Palumbo were aware that the sexual harassment was ongoing, that it had become routine, and was carried out by CEO Rivera.

78.     In and around the time of a New York Times article alleging accusations of inappropriate misconduct by CEO Rivera, CEO Rivera's employment was terminated.

79.     Following CEO Rivera's termination, Defendant New York City and/or NYC Dept. Of Homeless Services directed Defendant Network to appoint Daniel Tietz as its interim CEO (hereinafter "CEO Tietz").

80.     Defendant CEO Tietz was aware that CEO Rivera subjected Ms. Chavannes to sexual harassment.

81.     On February 18, 2021, Defendant CEO Tietz terminated Ms. Chavannes' employment, citing alleged poor performance, despite his awareness of the retaliation and harassment perpetrated by Ms. Chavannes' supervisors and despite him knowing that she exhibited no poor performance.

82.     The assertion of poor performance as rationale for terminating Ms. Chavannes is a pretext for retaliating against Ms. Chavannes for reporting sexual harassment in the Workplace by CEO Rivera, HR Supervisor Palumbo, and HR Head Clarke.

83.     Plaintiff has suffered from the effect of the aforementioned recent inappropriate, disturbing behavior and gender-based sexual discrimination, hostile work environment, and retaliation, causing emotional distress and anxiety.

84.     Plaintiff has suffered and continues to suffer economic and emotional distress, depression humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence and emotional pain and suffering for which she is entitled to an award of monetary damages and other relief.

85.     Defendants' acts and omissions caused Plaintiff to feel emotionally and physically violated and agitated, for Defendant's unfair and different treatment of them apart from other employees.

14

86.     Defendants retaliated to Plaintiff's rightful complaints by wrongfully terminating Plaintiff.

87.     As a result of the acts and conduct complained of herein, Plaintiff has suffered emotional pain, suffering, inconvenience, non-pecuniary losses, as well as pecuniary losses.

88.     As Defendants' conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law, Plaintiff demands a punitive damage assessment against Defendants.

89.     In sum, Plaintiffs seeks damages for past and future lost wages, emotional distress, attorneys' fees, and punitive damages.

**COUNT 1**
**UNDER FEDERAL TITLE VII**
**Sex & Race Discrimination**
**(Against Defendant Entities)**

90.     Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

91.     This claim is authorized and instituted pursuant to the provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. Section(s) 2000e et seq., as amended, and 42 U.S.C. § 1981, for relief based upon the unlawful employment practices of Defendants.

92.     Plaintiff complains of Defendants violation of Title VII's prohibition against discrimination in employment based, in whole or in part, upon an employee's sex, gender, and race.

93.     SEC. 2000e-2. [Section 703] states as follows:

(a) Employer practices
It shall be an unlawful employment practice for an employer -

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

94.     Defendants violated the section cited herein as set forth and engaged in

unlawful employment practices prohibited by 42 U.S.C. §2000e et seq., by creating and

maintaining a hostile discriminating work environment against Plaintiff because of her

sex, gender, and race.

## COUNT 2
## UNDER FEDERAL TITLE VII
### Retaliation
### (Against Defendant Entities)

95.     Plaintiff repeats and realleges each and every allegation made in the above

paragraphs of this Complaint.

Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-3(a) provides that it shall be unlawful employment practice for an employer:
(1) to . . . discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

96.     Defendants violated the section cited herein as set forth and retaliated against

Plaintiff because she opposed Defendants' unlawful employment practices.

## COUNT 3
## UNDER N.Y.S. EXECUTIVE LAW
### Sex & Race  Discrimination
### (Against Defendant Entities)

97.     Plaintiff repeats, reiterates and realleges each and every allegation made in the

above paragraphs of this Complaint as if more fully set forth herein at length.

98.     Executive Law § 296 provides that :

1. It shall be an unlawful discriminatory practice: "(a) For an employer or licensing agency, because of an individual's age, race, creed, color, national origin, sexual orientation, military status, sex, disability, predisposing genetic characteristics, marital status, or domestic violence victim status, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment.

99.     Defendants violated the section cited herein as set forth and engaged in an

unlawful discriminatory practice by creating and maintaining a hostile discriminating

work environment by against Plaintiff because of her sex, gender, and race.


**COUNT 4**
**UNDER N.Y.S. EXECUTIVE LAW**
**Retaliation**
**(Against Defendant Entities)**

100.    Plaintiff repeats and realleges each and every allegation made in the above

paragraphs of this Complaint.

101.    New York State Executive Law §296(7) provides that it shall be an unlawful:

For any person engaged in any activity to which this section applies to retaliate or discriminate against any person because [s]he has opposed any practices forbidden under this article.

102.    Defendants violated the section cited herein as set forth and engaged in an

unlawful discriminatory practice by retaliating and otherwise discriminating against the

Plaintiff because of Plaintiff's opposition to the unlawful employment practices of

Defendants.

**COUNT 5**
**UNDER N.Y.S. EXECUTIVE LAW**
**Aiding & Abetting**
**(Against All Defendants)**

103.    Plaintiff repeats and realleges each and every allegation made in the above

paragraphs of this Complaint.

104.    New York State Executive Law §296(6) provides that it shall be an unlawful

discriminatory practice:

"For any person to aid, abet, incite compel or coerce the doing of any acts forbidden
under this article, or attempt to do so."

105.    Defendants violated the section cited herein as set forth and engaged in an

unlawful discriminatory practice in violation of New York State Executive Law §296(6)

by aiding, abetting, inciting, compelling and coercing the discriminatory conduct.


**COUNT 6**
**UNDER THE NEW YORK CITY ADMINISTRATIVE CODE**
**Sex & Race Discrimination**
**(Against All Defendants)**

106.    Plaintiff repeats, reiterates and realleges each and every allegation made in the

above paragraphs of this Complaint as if more fully set forth herein at length.

107.    The Administrative Code of City of NY § 8-107 [1] provides that "It shall be an

unlawful discriminatory practice:

(a) For an employer or an employee or agent thereof, because of the actual or
perceived age, race, creed, color, national origin, gender, disability, marital status,
sexual orientation or alienage or citizenship status of any person, to refuse to hire or
employ or to bar or to discharge from employment such person or to discriminate
against such person in compensation or in terms, conditions or privileges of
employment.

108.    Defendants engaged in an unlawful discriminatory practice in violation of New

York City Administrative Code Title 8, §8-107(l)(a) by creating and maintaining a hostile

discriminating work environment by against Plaintiff because of her sex, gender, and race.

## COUNT 7
## UNDER THE NEW YORK CITY ADMINISTRATIVE CODE
### NYC Retaliation
### (Against All Defendants)

109.    Plaintiff repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

110.    The New York City Administrative Code Title 8, §8-107(l)(e) provides that it shall be unlawful discriminatory practice:

"For an employer... to discharge ... or otherwise discriminate against any person because such person has opposed any practices forbidden under this chapter..."

111.    Defendants engaged in an unlawful discriminatory practice in violation of New York City Administrative Code Title 8, §8-107(l)(e) by discriminating against the Plaintiff because of Plaintiff's opposition to the unlawful employment practices of Defendants.

## COUNT 8
## UNDER THE NEW YORK CITY ADMINISTRATIVE CODE
### Aiding & Abetting
### (Against Individual Defendants)

112.    Plaintiff repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

New York City Administrative Code Title 8-107(19) Interference with protected rights. It shall be an unlawful discriminatory practice for any person to coerce, intimidate, threaten or interfere with, or attempt to coerce, intimidate, threaten or interfere with, any person in the exercise or enjoyment of, or on account of his or her having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected pursuant to this section.

113.    Defendants violated the section cited herein as set forth and engaged in an

unlawful discriminatory practice in violation of New York City Administrative Code Title 8-107(19) by aiding, abetting, inciting, compelling and coercing the discriminatory conduct.

**COUNT 9**
**UNDER THE NEW YORK CITY ADMINISTRATIVE CODE**
**Vicarious Liability**
**(Against Defendant Entities)**

114.    Plaintiff repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length:

New York City Administrative Code Title 8-107(13) Employer liability for discriminatory conduct by its employees, agents or independent contractors.

(a)      An employer shall be liable for an unlawful discriminatory practice based upon the conduct of an employee or agent which is in violation of any provision of this section other than subdivisions one and two of this section.

(b)      An employer shall be liable for an unlawful discriminatory practice based upon the conduct of an employee or agent which is in violation of subdivision one or two of this section only where:

(1)      the employee or agent exercised managerial or supervisory responsibility; or

(2)      the employer knew of the employee's or agent's discriminatory conduct, and acquiesced in such conduct or failed to take immediate and appropriate corrective action; an employer shall be deemed to have knowledge of an employee's or agent's discriminatory conduct where that conduct was known by another employee or agent who exercised managerial or supervisory responsibility;  or

(3)      the employer should have known of the employee's or agent's discriminatory conduct and failed to exercise reasonable diligence to prevent such discriminatory conduct.

115.    Defendants violated the section cited herein as set forth.

**COUNT 10**
**CIVIL BATTERY**
**(Against CEO Rivera)**

116.    Plaintiff incorporates herein by reference the preceding paragraphs as if fully set forth herein.

117.    CEO Rivera intended to commit an act of unwanted contact and/or caused imminent apprehension of such an act against Plaintiffs. He did so by, inter alia:

    a. Isolating Plaintiff in closed quarters and dismissing any bystanders; and

    b. Initiating or threatening sexual contact.

118.    CEO Rivera did commit an unwanted contact with Plaintiff in a harmful or offensive manner, including but not limited to causing sexual contact between himself and Plaintiff.  CEO Rivera's battery of Plaintiff caused harm, including physical, mental, and/or emotional harm to Plaintiff.  CEO Rivera's conduct was committed within the scope of his employment at Defendant Entities.

**COUNT 11**
**ASSAULT**
**(Against CEO Rivera)**

119.    Plaintiff incorporates herein by reference the preceding paragraphs as if fully set forth herein.

120.    CEO Rivera intended to cause apprehension of harmful or offensive conduct against Plaintiff. He did so by, inter alia:

    a. Isolating Plaintiff in closed quarters and dismissing any bystanders;

    b. Demanding or threatening sexual contact;

    c. Cornering or otherwise using his heft to cause Plaintiff to fear that CEO Rivera had the ability to carry out his physical threats; and

121.   CEO Rivera's actions did, in fact, cause Plaintiff to fear imminent sexually offensive contact by CEO Rivera.

## Relief

WHEREFORE, Plaintiff respectfully demands against Defendants on each and every respective Count:

(a)   An award to Plaintiff of compensatory damages in an amount to be determined at trial for all damages including but not limited to economic damages for lost past back pay and future front pay wages and attendant benefits;

(b)   An award to Plaintiff of compensatory damages in an amount to be determined at trial for all damages including but not limited to past and future non-economic damages for humiliation, pain and suffering and emotional distress sustained;

(c)   An award to Plaintiff of the costs of this action, including their reasonable attorney's fees to the fullest extent permitted by law;

(d)   An award of punitive damages in an amount to be determined at trial; and

(e)   Such other and further relief as this Court deems necessary and proper.

## Jury Demand

Plaintiff requests a jury trial on all issues to be tried.

*Joshua Gittleman*

Joshua Gittleman, Esq.
DeTOFFOL & GITTLEMAN, Attorneys at Law
125 Maiden Lane – Suite 5C
New York, New York  10038
Tel. (212) 962-2220
Attorneys for Plaintiff

EEOC Form 161-B (11/2020)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## NOTICE OF RIGHT TO SUE *(ISSUED ON REQUEST)*

| To: | **Diamond Chavannes**<br>**47 St. Nicholas Avenue**<br>**Apt. 2C**<br>**New York, NY 10026** | From: | **New York District Office**<br>**33 Whitehall Street**<br>**5th Floor**<br>**New York, NY 10004** |
|---|---|---|---|

☐ *On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| **520-2021-01877** | **Gwendolyn D. Hoy,**<br>**Investigator** | **(929) 506-5313** |

*(See also the additional information enclosed with this form.)*

**NOTICE TO THE PERSON AGGRIEVED:**

**Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act (ADA), or the Genetic Information Nondiscrimination Act (GINA):** This is your Notice of Right to Sue, issued under Title VII, the ADA or GINA based on the above-numbered charge.  It has been issued at your request.  Your lawsuit under Title VII, the ADA or GINA **must be filed in a federal or state court <u>WITHIN 90 DAYS</u> of your receipt of this notice**; or your right to sue based on this charge will be lost.  (The time limit for filing suit based on a claim under state law may be different.)

☐  More than 180 days have passed since the filing of this charge.

☒  Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of this charge.

☒  The EEOC is terminating its processing of this charge.

☐  The EEOC will continue to process this charge.

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge.  In this regard, **the paragraph marked below applies to your case:**

☐  The EEOC is closing your case.  Therefore, your lawsuit under the ADEA **must be filed in federal or state court <u>WITHIN 90 DAYS</u>** of your receipt of this Notice.  Otherwise, your right to sue based on the above-numbered charge will be lost.

☐  The EEOC is continuing its handling of your ADEA case.  However, if 60 days have passed since the filing of the charge, you may file suit in federal or state court under the ADEA at this time.

**Equal Pay Act (EPA):**  You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment.  This means that **backpay due for any violations that occurred <u>more than 2 years (3 years)</u>** before you file suit may not be collectible.

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

Gwendolyn D Hoy
Digitally signed by Gwendolyn D Hoy
Date: 2021.06.04 17:42:58 -04'00'     For

_____          _____

Enclosures(s)                    **Judy A. Keenan,**          *(Date Issued)*
                                 **District Director**

cc:
| **Mario Palumbo**<br>**Director of Human Resources**<br>**THE BRONX PARENT HOUSING NETWORK, INC.**<br>**488 East 164th Street**<br>**Bronx, NY 10457** | **Joshua Gittleman, Esq.**<br>**DETOFFOL & GITTLEMAN, ATTORNEYS AT LAW**<br>**125 Maiden Lane,**<br>**Suite 5C,**<br>**New York, NY 10028** |
|---|---|